UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

DEEP SOUTH TODAY, *d/b/a* VERITE NEWS, GANNETT CO., INC., GRAY LOCAL MEDIA, INC., NEXSTAR MEDIA, INC., SCRIPPS MEDIA INC., and TEGNA INC.,

    *Plaintiffs*,

  v.

LIZ MURRILL, *in her official capacity as Attorney General of Louisiana*, ROBERT P. HODGES, *in his official capacity as Superintendent of the Louisiana State Police*, and HILLAR C. MOORE, III, *in his official capacity as District Attorney of East Baton Rouge Parish*,

    *Defendants*.

CASE NO. 3:24-cv-00623

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**STERNBERG NACCARI & WHITE LLC**
Scott L. Sternberg, La. Bar No. 33390
M. Suzanne Montero, La. Bar No. 21361
935 Gravier Street, Suite 2020
New Orleans, LA 70112
Phone: (504) 324-1887
Fax: (504) 534-8961
scott@snw.law | suzy@snw.law

Katie Townsend*
ktownsend@rcfp.org
Grayson Clary*
gclary@rcfp.org
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Fax: 202.795.9310

*\* admitted pro hac vice*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

ARGUMENT ............................................................................................................... 10

I.    Plaintiffs are likely to succeed on the merits of their arguments that HB 173 violates the
First and Fourteenth Amendments........................................................................... 10

    A.    Plaintiffs have standing to challenge HB 173. ...................................................... 11

    B.    HB 173 violates the First Amendment as applied to Plaintiffs' peaceful,
nonobstructive newsgathering within twenty-five feet of a peace officer. ........... 13

    C.    HB 173 violates the First Amendment on its face. ............................................... 18

    D.    HB 173 is void for vagueness under the Due Process Clause. ............................. 22

II.   The remaining factors favor preliminary injunctive relief.................................... 24

CONCLUSION........................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Agnew v. District of Columbia*,
   920 F.3d 49 (D.C. Cir. 2019) ................................................. 23

*Am. C.L. Union of Ill. v. Alvarez*,
   679 F.3d 583 (7th Cir. 2012) ................................................. 17

*Ashcroft v. Am. C.L. Union*,
   542 U.S. 656 (2004) ................................................. 19

*Bell v. Keating*,
   697 F.3d 445 (7th Cir. 2012) ................................................. 21, 22, 23

*Blitch v. City of Slidell*,
   260 F. Supp. 3d 656 (E.D. La. 2017) ................................................. 20

*Book People, Inc. v. Wong*,
   91 F.4th 318 (5th Cir. 2024) ................................................. 10, 25

*Brown v. Kemp*,
   86 F.4th 745 (7th Cir. 2023) ................................................. *passim*

*City of Chicago v. Morales*,
   527 U.S. 41 (1999) ................................................. *passim*

*City of Houston v. Hill*,
   482 U.S. 451 (1987) ................................................. 15

*City of Lakewood v. Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988) ................................................. *passim*

*Colten v. Kentucky*,
   407 U.S. 104 (1972) ................................................. 21

*Ctr. for Individual Freedom v. Carmouche*,
   449 F.3d 655 (5th Cir. 2006) ................................................. 11, 13

*Cummings v. Missouri*,
   71 U.S. (4 Wall.) 277 (1866) ................................................. 1

*Fields v. City of Phila.*,
   862 F.3d 353 (3d Cir. 2017) ................................................. 18

*Forsyth Cnty. v. Nationalist Movement*,
    505 U.S. 123 (1992) ............................................................................................ 19

*Gitlow v. New York*,
    268 U.S. 652 (1925) ............................................................................................ 23

*Glik v. Cunniffe*,
    655 F.3d 78 (1st Cir. 2011) ........................................................................... 11, 16

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ............................................................................................ 25

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ............................................................................................ 2, 14

*In re Express-News Corp.*,
    695 F.2d 807 (5th Cir. 1982) .............................................................. 2, 12, 14, 17

*Jordan v. Jenkins*,
    73 F.4th 1162 (10th Cir. 2023) ...................................................................... 12, 14

*Kay v. White*,
    286 F. Supp. 684 (E.D. La. 1968) ..................................................................... 23

*Kolender v. Lawson*,
    461 U.S. 352 (1983) .............................................................................................. 1

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ........................................................................ 16, 19, 20, 22

*Mills v. Alabama*,
    384 U.S. 214 (1966) ............................................................................................ 26

*Nat'l Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) .......................................................................... 12, 21

*Netflix, Inc. v. Babin*,
    88 F.4th 1080 (5th Cir. 2023) ............................................................................ 10

*Perkins v. Hart*,
    No. 22-30456, 2023 WL 8274477 (5th Cir. Nov. 30, 2023) ................................. 2, 16, 17, 20

*Randall v. Sorrell*,
    548 U.S. 230 (2006) ............................................................................................ 22

*Reed v. Lieurance*,
    863 F.3d 1196 (9th Cir. 2017) ........................................................................... 17

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ................................................................................................ 15, 20

*Schenck v. Pro-Choice Network of W. N.Y.*,
  519 U.S. 357 (1997) ...................................................................................................... 24

*Sheppard v. Maxwell*,
  384 U.S. 333 (1966) ...................................................................................................... 18

*Shuttlesworth v. City of Birmingham*,
  382 U.S. 87 (1965) .................................................................................................... 1, 25

*Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*,
  742 F.3d 282 (7th Cir. 2014) ........................................................................................ 19

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) .................................................................................................... 2, 15

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020),
  *as revised* (Oct. 30, 2020) ...................................................................................... 11, 12

*Steffel v. Thompson*,
  415 U.S. 452 (1974) ...................................................................................................... 12

*Turner v. Lieutenant Driver*,
  848 F.3d 678 (5th Cir. 2017) ............................................................................... 1, 12, 15

*United States v. Williams*,
  553 U.S. 285 (2008) .................................................................................................. 11, 24

*Vincent v. City of Sulphur*,
  805 F.3d 543 (5th Cir. 2015) ......................................................................................... 23

**Statutes**

Fla. Stat. § 843.31 .................................................................................................................. 22

Ind. Code § 35-44.1-2-14 ....................................................................................................... 22

La. Rev. Stat. § 14:109 ........................................................................................................ 1, 3

La. Rev. Stat. § 14:112.4 .......................................................................................................... 3

La. Rev. Stat. § 14:329 ................................................................................................... 1, 15, 20

La. Rev. Stat. § 14:329.3 ......................................................................................................... 20

La. Rev. Stat. § 40:1379 ....................................................................................................... 3, 13

La. Rev. Stat. § 40:2402 .................................................................................................... 3

**Other Authorities**

Ange Toussaint, *Governor Jeff Landry Signs Education Reform Bill*,
    KATC (June 19, 2024),
    https://perma.cc/J658-655E .................................................................................... 4, 5

Clarissa Sosin & Daryl Khan, *In the Dark: Investigating Baton Rouge Police
    Department*, Verite News (2023),
    https://veritenews.org/in-the-dark-series/ ..................................................................... 6

Curt Sprang, *Two Dead in Mandeville Following Welfare Check Turned Police Shooting*,
    WGNO (July 6, 2024),
    https://bit.ly/4f5TcLS ....................................................................................................... 6

Emily Enfinger, *Hundreds Participate in Shreveport Black Lives Matter March*,
    Shreveport Times (May 31, 2020),
    https://perma.cc/BVK7-8TZ3 ........................................................................................ 5

Hearing on HB 173 Before the H. Comm. on the Administration of Criminal Justice,
    2024 Reg. Sess. (La. Mar. 26, 2024),
    https://house.louisiana.gov/H_Video/VideoArchivePlayer?v
    =house/2024/mar/0326_24_CJ ................................................................. 3, 4, 17, 18

Jazmin Thibodeaux, *Black History: LPD Remembers First Two African-American
    Officers on the Force*, KATC (Feb. 21, 2024),
    https://perma.cc/UDG2-5QZC ...................................................................................... 6

Jessica Knox, *Heavy Police Presence Planned for LSU vs. Southern Game*,
    BRProud (Sept. 8, 2022),
    https://bit.ly/3LoBm9j ..................................................................................................... 5

Jordan Lippincott, *Preparations Underway for Super Bowl LIX in New Orleans*,
    WGNO (Feb. 21, 2024),
    https://bit.ly/3WoThlF ..................................................................................................... 5

Kenny Kuhn, *WWL Mardi Gras Parade Coverage from New Orleans*,
    4WWL (Feb. 13, 2024),
    https://perma.cc/4W3Z-2VQL ....................................................................................... 4

Mario Villafuerte & Makenzie Boucher, *Cat Stands Guard at Shreveport Crime Scene*,
    Shreveport Times (Apr. 7, 2022),
    https://bit.ly/4cT5GFj...................................................................................................... 6

Metia Carroll, *Louisiana AG Liz Murrill and Orleans DA Jason Williams Execute
    Agreement to Make New Orleans Safe*, WDSU (Feb. 6, 2024),
    https://perma.cc/L2Y6-YEA7 ...................................................................................... 13

Michael Scheidt & Trinity Velazquez, *Police Chief Puts More Cops on the Street After Baton Rouge Had 28 Shootings in March*, BRProud (Mar. 25, 2024), https://www.brproud.com/news/local-news/crime/baton-rouge-police-discuss-recent-shootings-in-the-city/ ................................................................................ 6

Michael Scheidt, *Louisiana Gov. Jeff Landry Signs Health Care Bills Into Law*, WGNO (June 25, 2024), https://bit.ly/3S9ivmF ......................................................................................... 5

Michelle Liu, *After Protest Crackdown, Some Students and Faculty Criticize Tulane's Approach to Pro-Palestinian Speech*, Verite News (May 6, 2024), https://perma.cc/Z6ZB-DP82 ...................................................................... 5

*NOPD Uses Tear Gas to Disperse Protesters After Nights of Peaceful Marches*, 4WWL (June 3, 2020), https://perma.cc/XWJ9-8AM9 ...................................................................... 5

Peyton LoCicero Trist, *New Orleanians Rally for Justice*, WGNO (May 31, 2020), https://bit.ly/3zHXXLx ...................................................................................... 5

*Police in Support of Peaceful Protests Planned in St. Martinville*, KATC (July 9, 2020), https://perma.cc/7EUC-B677 ...................................................................... 5

Raeven Poole, *Law Enforcement Agencies Raid Pro-Palestine Protest on Tulane University Campus*, WGNO (May 1, 2024), https://bit.ly/3XYmE0o ...................................................................................... 5

Richard A. Webster, *Video of Mother's Arrest Raises Questions About 25-Foot Buffer Law*, La. Illuminator (June 9, 2023), https://perma.cc/L4TC-YADT ............................................................... 16, 17

U.S. Dep't of Transp., Primer for Improved Urban Freight Mobility and Delivery Operations, Logistics, and Technology Strategies (last visited Aug. 2, 2024), https://perma.cc/D4A8-KWS7 ...................................................................... 9

Zipporah Osei et al., *We Are Tracking What Happens to Police After They Use Force on Protestors*, ProPublica (July 29, 2020), https://perma.cc/D63N-EKSQ ...................................................................... 18

**Constitutional Provisions**

La. Const. art. III, § 19 ................................................................................. 4

La. Const. art. IV, § 8 .................................................................................. 13

La. Const. art. V, § 26 ................................................................................. 13

## INTRODUCTION

More than fifty years ago, the Supreme Court held that a statute that "says that a person may stand on a public sidewalk . . . only at the whim of any police officer" would be so flagrantly unconstitutional as to "need[] no demonstration." *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965). Louisiana has enacted that law, vesting officers with standardless discretion to prevent the press and public from approaching near enough to document their official duties. *See* La. Rev. Stat. § 14:109 ("HB 173" or the "Act"). Because the First Amendment makes clear that the right to gather news cannot be conditioned on the arbitrary "moment-to-moment judgment of the policeman on his beat," *Kolender v. Lawson*, 461 U.S. 352, 360 (1983) (citation omitted), this Court should enjoin the Act's enforcement.

Effective August 1, 2024, the Act criminalizes "knowingly or intentionally approach[ing] within twenty-five feet of a peace officer who is lawfully engaged in the execution of his official duties after the peace officer has ordered the person to stop approaching or to retreat." La. Rev. Stat. § 14:109(A). But because Louisiana law already prohibits conduct that obstructs officers' duties, *see* La. Rev. Stat. § 14:329, the law's "only evident purpose" is "to reach expressive activity that does not involve physical interference," *Brown v. Kemp*, 86 F.4th 745, 782 (7th Cir. 2023). In other words, the statute is an obvious effort to circumvent the "First Amendment right to record the police." *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017). But "[t]he Constitution deals with substance, not shadows," *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1866), and Louisiana's sleight of hand does nothing to cure the Act's "ever-present potential for arbitrarily suppressing First Amendment liberties," *Shuttlesworth*, 382 U.S. at 91.

The Act violates the Constitution in multiple respects. For one, it violates the First Amendment as applied to Plaintiffs' peaceful, nonobstructive newsgathering in public places.

1

"[A]n inhibition of press news-gathering rights must be necessitated by a compelling governmental interest, and . . . narrowly tailored to serve that interest," *In re Express-News Corp.*, 695 F.2d 807, 808–09 (5th Cir. 1982) (citation and internal quotation marks omitted), but documenting newsworthy events where peace officers happen to be present does not "impede the [officers'] ability to perform their duties," even when an individual is "clearly close." *Perkins v. Hart*, No. 22-30456, 2023 WL 8274477, at *7 (5th Cir. Nov. 30, 2023). Thus, as applied to "the particular speech plaintiffs propose to undertake," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 36 (2010), the Act advances no valid interest.

The Act is likewise unconstitutional on its face. Because "the First Amendment protects conduct and activities necessary for expression," it also protects "approaching" newsworthy events to observe and document them. *Brown*, 86 F.4th at 779. Here the Act, in its "inevitable effect," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011) (citation omitted), imposes content-based burdens designed to chill newsgathering and speech about policing and, accordingly, it cannot survive strict scrutiny. Indeed, even if the Act could be construed as a time, place, and manner restriction, or a law that also regulates conduct, it still could not survive any level of constitutional scrutiny because it "vests unbridled discretion in a government official over whether to permit or deny expressive activity." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988). And for much the same reason, the Act is void for vagueness twice over: It "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," and it "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion).

Because the Act cannot be reconciled with the Constitution, Plaintiffs—organizations that gather and report the news in Louisiana—respectfully move this Court to enjoin it.

# BACKGROUND

## I.    Louisiana adopts the Act.

On May 24, 2024, Louisiana Governor Jeff Landry signed into law HB 173, which, in relevant part, makes it a criminal offense to "knowingly or intentionally approach within twenty-five feet of a peace officer who is lawfully engaged in the execution of his official duties after the peace officer has ordered the person to stop approaching or to retreat."  La. Rev. Stat. § 14:109(A).  The Act's definition of "peace officer" sweeps in a broad range of law enforcement agencies, *see id.* § 14:109(B) (cross-referencing La. Rev. Stat. § 14:112.4(B)(2) and La. Rev. Stat. § 40:2402(3)), including troopers of the Louisiana State Police, *see* La. Rev. Stat. § 40:2402(3)(a) (defining "peace officer" to include "any employee of the state . . . responsible for the prevention or detection of crime"); La. Rev. Stat. § 40:1379 (State Police "shall prevent and detect crime").  The Act's only affirmative defense provides that no liability attaches "if the defendant can establish that the lawful order or command was neither received nor understood by the defendant nor capable of being received or understood under the conditions and circumstances that existed at the time of the issuance of the order."  La. Rev. Stat. § 14:109(C). Otherwise, a violation of the statute is punishable by fines and imprisonment.  *Id.* § 14:109(D).

Addressing HB 173's effect on the public's ability to record law enforcement, the Act's sponsor, Rep. Bryan Fontenot, suggested without evidence that "there is really nothing within a twenty-five feet span that someone couldn't pick up on video if they were at five feet."  Hearing on HB 173 Before the H. Comm. on the Administration of Criminal Justice, at 1:40:35–45, 2024 Reg. Sess. (La. Mar. 26, 2024), https://house.louisiana.gov/H_Video/VideoArchivePlayer?v= house/2024/mar/0326_24_CJ.  But as Rep. Fontenot went on to acknowledge, some details

would be impossible to obtain while complying with the Act: "We aren't trying to read the officer's name on his uniform." *Id.* at 1:44:55–1:45:05.

The Act went into effect on August 1, 2024. *See* La. Const. art. III, § 19.

## II. Plaintiffs' newsgathering regularly brings their journalists in close proximity to peace officers performing official duties.

Plaintiffs are organizations that gather and report news in Louisiana on a regular basis. Deep South Today, *d/b/a* Verite News ("Verite"), Gannett Co., Inc. ("Gannett"), Gray Local Media, Inc. ("Gray"), Nexstar Media, Inc. ("Nexstar"), Scripps Media Inc. ("Scripps"), and TEGNA Inc. ("TEGNA") are all in the business of regularly gathering and publishing newsworthy information, and all employ professional journalists assigned to cover the activities of Louisiana law enforcement, including the Louisiana State Police, on a regular, ongoing basis.[1]

At each year's Carnival, for instance, journalists and members of the public from around the state cover the celebration of Mardi Gras from twelfth night to Ash Wednesday. On Lundi Gras and Mardi Gras—in addition to the weekends prior that include permitted and organized celebratory parading on Louisiana's public streets—Plaintiffs' reporters repeatedly come into close contact with peace officers from a range of law enforcement agencies that provide crowd control and direct traffic for the festivities. *See* Kenny Kuhn, *WWL Mardi Gras Parade Coverage from New Orleans*, 4WWL (Feb. 13, 2024), https://perma.cc/4W3Z-2VQL.

Plaintiffs' journalists likewise routinely encounter members of the State Police in Baton Rouge when covering press conferences held by the Governor, *see* Ange Toussaint, *Governor Jeff Landry Signs Education Reform Bill*, KATC (June 19, 2024), https://perma.cc/J658-655E, developments at the statehouse, Michael Scheidt, *Louisiana Gov. Jeff Landry Signs Health Care*

---

[1]    A full list of Plaintiffs' individual stations, newspapers, and other properties in Louisiana that are now regulated by the Act is set forth in the Complaint. *See* Complaint ¶¶ 17–22 (ECF No. 1).

*Bills Into Law*, WGNO (June 25, 2024), https://bit.ly/3S9ivmF, and Louisiana State University

(LSU) football games where State Police troopers provide security, Jessica Knox, *Heavy Police*

*Presence Planned for LSU vs. Southern Game*, BRProud (Sept. 8, 2022), https://bit.ly/3LoBm9j.

Civil disturbances also bring Plaintiffs' reporters into close contact with peace officers.

For example, Plaintiffs reported extensively on protests in June 2020,[2] and more recently

covered the clearing of a pro-Palestine encampment on the campus of Tulane University.  *See,*

*e.g.*, Raeven Poole, *Law Enforcement Agencies Raid Pro-Palestine Protest on Tulane University*

*Campus*, WGNO (May 1, 2024), https://bit.ly/3XYmE0o; *see also* Michelle Liu, *After Protest*

*Crackdown, Some Students and Faculty Criticize Tulane's Approach to Pro-Palestinian Speech*,

Verite News (May 6, 2024), https://perma.cc/Z6ZB-DP82.  All of that coverage required close

contact with officers and often relied on videos or photographs captured within twenty-five feet.

A broad range of other assemblies, rallies, and newsworthy public events similarly bring

Plaintiffs' reporters into close contact with Louisiana law enforcement on a routine basis—and

will continue to do so for the foreseeable future.  *See, e.g.*, Jordan Lippincott, *Preparations*

*Underway for Super Bowl LIX in New Orleans*, WGNO (Feb. 21, 2024), https://bit.ly/3WoThlF.

And reporting within a twenty-five-foot radius of law enforcement officers performing official

responsibilities is likewise essential in other contexts, including at crime scenes[3] and in

interviews or press conferences held by public officials or members of law enforcement.[4]

---

[2]        *See, e.g.*, Emily Enfinger, *Hundreds Participate in Shreveport Black Lives Matter March*, Shreveport
Times (May 31, 2020), https://perma.cc/BVK7-8TZ3; *Police in Support of Peaceful Protests Planned in St.*
*Martinville*, KATC (July 9, 2020), https://perma.cc/7EUC-B677; *NOPD Uses Tear Gas to Disperse Protesters After*
*Nights of Peaceful Marches*, 4WWL (June 3, 2020), https://perma.cc/XWJ9-8AM9; Peyton LoCicero Trist, *New*
*Orleanians Rally for Justice*, WGNO (May 31, 2020), https://bit.ly/3zHXXLx.

[3]        *See, e.g.*, Curt Sprang, *Two Dead in Mandeville Following Welfare Check Turned Police Shooting*, WGNO
(July 6, 2024), https://bit.ly/4f5TcLS; Mario Villafuerte & Makenzie Boucher, *Cat Stands Guard at Shreveport*
*Crime Scene*, Shreveport Times (Apr. 7, 2022), https://bit.ly/4cT5GFj.

[4]        *See, e.g.*, Michael Scheidt & Trinity Velazquez, *Police Chief Puts More Cops on the Street After Baton*
*Rouge Had 28 Shootings in March*, BRProud (Mar. 25, 2024), https://www.brproud.com/news/local-

All told, in the course of their work, individual journalists employed by Plaintiffs may come into close contact with peace officers as often as once a day depending on the news cycle. Richard Erbach, News Director for Nexstar station WGNO, estimates that reporters and photojournalists in his newsroom will come "within twenty-five feet of law enforcement officers virtually every day for the foreseeable future."  Decl. of Richard Erbach ("Erbach Decl.") ¶ 19; *see also* Decl. of Nicole Waivers ("Waivers Decl.") ¶ 6 (estimating that journalists for TEGNA station 4WWL are "in close contact with officers" covering crime scenes "multiple times a week").  And while Plaintiffs' journalists are "careful not to interfere with anything [law enforcement officers] are doing," their jobs often require them "to be as close as a few feet to record audio and put the mic as close as we can" in order to capture what individuals are saying. Decl. of Jazmin Thibodeaux Chretien ("Thibodeaux Decl.") ¶ 7; *see also* Decl. of Curtis Sprang ("Sprang Decl.") ¶ 4 ("When reporting on law enforcement, I try to get as close as I can without causing problems so that I can pick up good-quality audio of what the officer is saying.").

Based on their professional experience, Plaintiffs' journalists—whether they are taking photographs, recording video, or visually observing newsworthy events so they can report on them accurately—"need to be within a conversational distance" to hear when "a police officer is saying something to someone on a scene," Sprang Decl. ¶ 4, or to speak to potential sources, *see* Thibodeaux Decl. ¶ 5.  To record audio that can be used in a broadcast, Plaintiffs' journalists estimate needing to be "within five feet."  Decl. of Katherine Jane Fernelius ("Fernelius Decl.") ¶ 6; *see also* Erbach Decl. ¶ 8; Thibodeaux Decl. ¶ 7.  And Plaintiffs' reporters likewise need to be as close as they can to get an unobstructed view of details like an officer's badge number or the

---

news/crime/baton-rouge-police-discuss-recent-shootings-in-the-city/; Jazmin Thibodeaux, *Black History: LPD Remembers First Two African-American Officers on the Force*, KATC (Feb. 21, 2024), https://perma.cc/UDG2-5QZC; Clarissa Sosin & Daryl Khan, *In the Dark: Investigating Baton Rouge Police Department*, Verite News (2023), https://veritenews.org/in-the-dark-series/.

name on his uniform.  *See* Fernelius Decl. ¶ 5; *see also* Erbach Decl. ¶ 8 (estimating that it is difficult to avoid an obstructed view from more than fifteen feet away).  In the experience of Nicole Waivers, News Director for TEGNA station 4WWL in New Orleans, her journalists need to "capture what's happening" and "keep [their] camera[s] pointed in the direction of the action," even when working in close proximity to officers, in order to do their jobs effectively.  Waivers Decl. ¶¶ 13–14.  As Waivers puts it, "As journalists, we create the first record of history.  We are responsible for giving the public a correct impression of what is happening."  *Id.* ¶ 22.

## III.    The Act's impact on Plaintiffs' newsgathering.

Because Plaintiffs' journalists often are asked by law enforcement to move or step back while gathering the news—requests that were, until August 1, voluntary—they must now adjust their behavior to avoid the risk of arrest under the Act.  Erbach, News Director at WGNO, estimates "that a member of the WGNO newsroom is . . . asked to step back or move away from an officer around once a week."  Erbach Decl. ¶ 17.  And in Plaintiffs' reporters' experience, peace officers often make such requests even where there is no risk of interference.

For example, in July, Patrick Thomas, Chief Photographer at WGNO, was "covering a crash scene in Jefferson Parish where police chased a suspect and ran the suspect off the road."  Decl. of Patrick Thomas ("Thomas Decl.") ¶ 7.  By the time Thomas arrived, "the police were putting the suspect in an ambulance" and "[t]he suspect was saying something about the police officers."  Thomas "got closer to try to hear what was being said."  *Id.*  He "heard the suspect say that he had been punched in the mouth and tased six times, that he was a businessman just trying to collect scooters, and that 'not all Jefferson Parish officers are bad officers, just that one.'"  *Id.* ¶ 8.  After he heard the suspect criticize one of the arresting officers, "[a]n officer then came over and told me and another journalist from a different station to move back."  *Id.* ¶ 9.  Thomas and

the other journalist "both stepped back several feet, but the officer then asked [them] to move across the street on the other side of an active lane of traffic." *Id.* ¶ 10. Thomas "was reluctant to cross," both because of a "concern for [his] own safety," but also because he did not want his view of the scene to be obstructed. *Id.* The officer "was insistent," telling him "over and over again to cross the street, even though [he] was not interfering with anything that was happening at the scene." *Id.* Thomas believes the officer "ordered [him] to move back because the officer had a negative reaction to the suspect's criticism," *id.* ¶ 11, and recalled that "[t]he officer seemed ready to arrest me if he could find a reason to," *id.* ¶ 12. If the Act had been in effect, Thomas would have complied with the unwarranted requests rather than risk arrest. *Id.* ¶ 13.

Plaintiffs' journalists also must adjust the way they engage in newsgathering out of concern they will be unable to comply with HB 173 in practice. In newsroom discussions about the Act's impact, Plaintiffs' journalists have attempted—and struggled—to accurately estimate how far twenty-five feet is, *see* Waivers Decl. ¶ 16; Erbach Decl. ¶ 18; Thomas Decl. ¶ 15; Fernelius Decl. ¶ 15, and would not be able to reliably do so in the field, *see* Thomas Decl. ¶ 15; Fernelius Decl. ¶ 15; Thibodeaux Decl. ¶ 10. As a result, if an officer orders Plaintiffs' journalists "to move to a particular area and says that it is twenty-five feet away," they have "no good way of knowing if [the officer is] right or not," Thibodeaux Decl. ¶ 10.

Plaintiffs' newsroom directors also have struggled to provide guidance to their journalists regarding how to comply with the Act when physical obstacles would make it impossible, as in "a crowded situation like a parade." Waivers Decl. ¶ 18. For instance, Katie Fernelius, a reporter for Verite News, regularly covers activities of the New Orleans City Council and events in the French Quarter, but Fernelius does not know how she would comply with an order to stay twenty-five feet away in those spaces. Among other things, some rooms of the City Council's

chambers may be smaller than twenty-five feet wide, *see* Fernelius Decl. ¶ 10, and "streets in the interior of the French Quarter are 22 feet wide," U.S. Dep't of Transp., Primer for Improved Urban Freight Mobility and Delivery Operations, Logistics, and Technology Strategies (last visited Aug. 2, 2024), https://perma.cc/D4A8-KWS7.

In each situation, Plaintiffs' journalists must choose between complying with an order to stay back twenty-five feet—thereby losing their chance to gather newsworthy information—or facing arrest for being within twenty-five feet of a law enforcement officer.  Fernelius Decl. ¶ 17. One of Plaintiffs' journalists, Curtis Sprang of WGNO, brought up an expression he has "heard often in Louisiana" that "[y]ou might beat the charge, but you won't beat the ride."  Sprang Decl. ¶ 16.  In other words, "[e]ven if criminal charges wouldn't stand up [in court]," disobeying an order by a peace officer means you "risk enduring the process of being handcuffed, transported in the back of a police car, and waiting in jail for hours."  *Id.*  Sprang said he does "not want to be in that situation just for doing [his] job, so [he] would comply with an officer's request to move even though [he is] not interfering with or obstructing officers, even if it means that [he] cannot gather the news."  *Id.*  Other journalists have likewise explained that the Act "will make [their] job[s] more dangerous" because they will not be able to get "close to see and hear what is going on" without facing "the risk of arrest."  Thomas Decl. ¶ 17.

As a result, Plaintiffs' newsroom directors have advised their journalists to err on the side of caution and comply with any requests to move or step back, no matter how unnecessary or unwarranted.  *See* Erbach Decl. ¶¶ 7–9; Waivers Decl. ¶ 18.  In the words of KATC Senior Reporter Jazmin Thibodeaux, "Without HB 173, I would insist on my rights to gather news and record in public places in response to a request by a law enforcement officer that was unreasonable under the circumstances."  Thibodeaux Decl. ¶ 10.  "With HB 173, I would comply

to the best of my ability and stay a long distance away" because "I do not want to be arrested for doing my job."  *Id.*

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction prohibiting enforcement of the Act.  In First Amendment cases, "likelihood of success on the merits"—already "arguably the most important factor" in that analysis, *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1099 (5th Cir. 2023)—is typically dispositive because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," and "[i]njunctions protecting First Amendment freedoms are always in the public interest," *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024) (citations omitted).  Here, Plaintiffs are likely to succeed in demonstrating that the Act violates their rights under the First and Fourteenth Amendments, and a preliminary injunction would serve the public interest by safeguarding the function of a free press in Louisiana.

## I.    Plaintiffs are likely to succeed on the merits of their arguments that the Act violates the First and Fourteenth Amendments.

The Act violates the First Amendment both as applied to Plaintiffs' newsgathering, because reporting "that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation," *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011), and on its face, because the Act "vests unbridled discretion in a government official over whether to permit or deny expressive activity," *City of Lakewood*, 486 U.S. at 755.  The Act is likewise void for vagueness:  Not only does it "fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," *Morales*, 527 U.S. at 56 (plurality opinion), but also it "is so standardless that it authorizes or encourages seriously discriminatory enforcement," *United*

*States v. Williams*, 553 U.S. 285, 304 (2008).  On each independent basis, Plaintiffs'

constitutional claims are likely to succeed on the merits.

      A.    <u>Plaintiffs have standing to challenge HB 173.</u>

      As a threshold matter, Plaintiffs have standing to challenge the Act.  "It is not hard to

sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations

governing bedrock political speech."  *Speech First, Inc. v. Fenves*, 979 F.3d 319, 331 (5th Cir.

2020), *as revised* (Oct. 30, 2020).  In this posture, "chilling of speech because of the mere

existence of an allegedly vague or overbroad statute can be sufficient injury to support standing,"

*Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006), even if "a plaintiff

does not intend to violate a policy," *Speech First*, 979 F.3d at 332 n.10, so long as they *do* intend

"to engage in a course of conduct arguably affected with a constitutional interest" and "arguably

proscribed" by the challenged statute, *id.* at 330 (citation and alteration omitted).  In such

circumstances, "when dealing with pre-enforcement challenges to recently enacted (or, at least,

non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff

belongs, courts will assume a credible threat of prosecution in the absence of compelling

contrary evidence."  *Id.* at 335 (citation omitted).

     This standard is more than satisfied here.  As to whether the activity arguably proscribed

by the Act is affected with a constitutionally protected interest, the Fifth Circuit has made clear

that the First Amendment safeguards "the right to gather news," *In re Express-News Corp.*, 695

F.2d at 809, including by capturing images, *see Nat'l Press Photographers Ass'n v. McCraw*, 90

F.4th 770, 789 (5th Cir. 2024), and by "[f]ilming the police" in particular, *Turner*, 848 F.3d at

689.  And because "the First Amendment protects conduct and activities necessary for

expression," it also protects "approaching" newsworthy events to observe and document them.

*Brown*, 86 F.4th at 779; *see also Jordan v. Jenkins*, 73 F.4th 1162, 1169–70 (10th Cir. 2023) (same).

The Act makes all of that expressive activity criminal if within twenty-five feet of a peace officer unless an officer opts in his or her sole, unfettered discretion to allow it—putting Plaintiffs' journalists "in danger of arrest in many of the circumstances [they] find [them]selves in on a weekly basis."  Fernelius Decl. ¶ 14.  And the Supreme Court has made clear, on that footing, that Plaintiffs need not "first expose [themselves] to *actual* arrest or prosecution to be entitled to challenge a statute that [they] claim[] deters the exercise of [their] constitutional rights."  *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (emphasis added); *see also City of Lakewood*, 486 U.S. at 755–56 (pre-enforcement challenge lies where a law "allegedly vests unbridled discretion . . . over whether to permit or deny expressive activity" where officials have yet to deny such permission).  The prospect that receiving an instruction to move or step back will shut down otherwise-lawful reporting is enough, and the fact that Plaintiffs' journalists are forced to err on the side of caution for fear of arrest when gathering information near peace officers is, itself, the "chilling" injury the First Amendment condemns.  *Carmouche*, 449 F.3d at 660; *see* Thibodeaux Decl. ¶ 10; Thomas Decl. ¶ 17; Fernelius Decl. ¶ 17; Sprang Decl. ¶ 16.

That injury is fairly traceable to Defendants, who are charged by state law with enforcing the Act, and a preliminary injunction would redress those injuries for much the same reason.  As the Attorney General of Louisiana, Defendant Liz Murrill is "the chief legal officer of the state" and may, "upon the written request of a district attorney, . . . advise and assist in the prosecution of any criminal case."  La. Const. art. IV, § 8.  What's more, in February, Murrill signed a cooperative endeavor agreement with the Orleans Parish District Attorney that gives the Attorney General the authority "to prosecute any and all criminal matters in Orleans Parish

resulting from an arrest or investigation conducted by Louisiana State Police." Metia Carroll, *Louisiana AG Liz Murrill and Orleans DA Jason Williams Execute Agreement to Make New Orleans Safe*, WDSU (Feb. 6, 2024), https://perma.cc/L2Y6-YEA7. She is therefore charged with enforcing the Act when State Police make arrests pursuant to it in New Orleans, where Plaintiffs' journalists routinely encounter State Police. *See, e.g.*, Waivers Decl. ¶¶ 10–12.

Defendant Hillar C. Moore, III, has "charge of every criminal prosecution by the state in his district" as District Attorney for East Baton Rouge Parish. La. Const. art. V, § 26. Plaintiffs' work often brings their journalists within twenty-five feet of peace officers in his district, covering events from LSU football games to happenings at the state capitol, *see* Erbach Decl. ¶ 6; Thibodeaux Decl. ¶ 6; Waivers Decl. ¶ 5, and Moore is charged with enforcing the Act in those circumstances. Defendant Robert P. Hodges is the Superintendent of the Louisiana State Police, and the troopers under his supervision and control have a duty to "enforce the criminal and traffic laws of the state"—including the Act. La. Rev. Stat. § 40:1379(A). Plaintiffs' journalists routinely encounter State Police in the course of doing their jobs, *see* Waivers Decl. ¶ 8; Fernelius Decl. ¶ 4; Sprang Decl. ¶ 3, and routinely run the risk they will enforce the Act. Accordingly, preliminary injunctive relief against each Defendant in his or her official capacity would redress the Act's chilling effect on Plaintiffs' First Amendment rights.

B.    The Act violates the First Amendment as applied to Plaintiffs' peaceful, <u>nonobstructive newsgathering within twenty-five feet of a peace officer.</u>

As detailed above, Plaintiffs' reporters regularly gather and report the news within twenty-five feet of a peace officer performing his or her duties—documenting events they could neither reliably see, hear, nor record if forced to retreat as far as the Act requires. The Act violates the First Amendment as applied to their peaceful, nonobstructive newsgathering.

13

Where plaintiffs bring an as-applied, pre-enforcement challenge to a statute, a court must first ask whether "as applied to plaintiffs the conduct triggering coverage under the statute" implicates the First Amendment, *Humanitarian Law Project*, 561 U.S. at 28, and, next, whether the statute satisfies the relevant standard of review as applied to "the particular speech plaintiffs propose to undertake," *id.* at 36. Both steps of that analysis are straightforward in this case.

As to the first question, as discussed above, the First Amendment protects "the right to gather news," *In re Express-News Corp.*, 695 F.2d at 809, and with it "approaching" newsworthy events in order to document them, *Brown*, 86 F.4th at 779 (prohibition on "approaching" hunters directly regulated First Amendment activity). Necessarily so; as the Tenth Circuit has explained: "If police could stop criticism or filming by asking onlookers to leave, then this would allow the government to simply proceed upstream and dam the source of speech—i.e., it would allow the government to bypass the Constitution." *Jordan*, 73 F.4th at 1169–70 (citation, internal quotation marks, and alterations omitted). Plaintiffs' "conduct triggering coverage under the statute" in this case—being within twenty-five feet of peace officers in order to gather news—is therefore pure First Amendment activity. *Humanitarian Law Project*, 561 U.S. at 28.

The Act cannot survive any plausibly relevant standard of review as applied to Plaintiffs' newsgathering. To start with the elephant in the room: The Act is content-based in its "inevitable effect," *Sorrell*, 564 U.S. at 565 (citation omitted); it is designed to and inevitably will discourage "[f]ilming the police," *Turner*, 848 F.3d at 689. The Seventh Circuit's recent decision in *Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023), is instructive on that issue. There, the court considered a First Amendment challenge to a Wisconsin ban on—among other things— "approaching" hunters. *Id.* at 753. While the state defended the law by arguing it regulated only obstructive conduct, the court noted that pre-existing law "already encompassed physical

14

interference," such that the new law's "only evident purpose" was "to reach expressive activity" in order "to burden a narrow category of disfavored speech." *Id.* at 782.  The statute was therefore content- and viewpoint-based.  *See id.*  The same is true here.  Because Louisiana law already prohibits conduct that in fact interferes or threatens to interfere with law enforcement, *see* La. Rev. Stat. § 14:329, the Act's sole purpose is to criminalize First Amendment-protected activity that does *not* interfere with law enforcement concerning a specific topic: peace officers' performance of their duties.  *See City of Houston v. Hill*, 482 U.S. 451, 459–61 (1987) (rejecting characterization of ordinance prohibiting interference with police as "content-neutral" where "the *enforceable* portion of the ordinance" in practice "prohibit[ed] verbal interruptions of police officers" (emphasis added)).

The Act's application to Plaintiffs' newsgathering cannot survive the "strict scrutiny" of "content-based restrictions on speech" required by the First Amendment—a standard that "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (citation omitted).  For one, criminalizing peaceful, nonobstructive newsgathering advances no legitimate—let alone compelling—government interest.  *See, e.g.*, *Glik*, 655 F.3d at 84 (holding that "peaceful recording . . . that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation").  Nor is the Act narrowly tailored.  The First Amendment prohibits the government from "regulat[ing] expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals," *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citation omitted), but the Act's scope is not tethered to any legitimate aim.  On the contrary, the Act empowers officers to order Plaintiffs' journalists to move for any reason or no reason at all—including because those officers want to control or

curtail the content of Plaintiffs' reporting.  And a statute that "vests unbridled discretion in a government official over whether to permit or deny expressive activity" is never adequately tailored.  *City of Lakewood*, 486 U.S. at 755.

Even setting that point aside, the statute is also overbroad because twenty-five feet is far further away than necessary to protect any legitimate interest.  As other courts have explained, even an individual recording from "roughly ten feet away," *Glik*, 655 F.3d at 80, is operating at "a comfortable remove," *id.* at 84 (citation omitted).  Indeed, the Fifth Circuit recently held that a man filming from six feet away was "clearly" protected by the First Amendment.  *Perkins*, 2023 WL 8274477, at *7; *see also* Richard A. Webster, *Video of Mother's Arrest Raises Questions About 25-Foot Buffer Law*, La. Illuminator (June 9, 2023), https://perma.cc/L4TC-YADT (noting that the plaintiff in *Perkins* was six feet away and defendants had unsuccessfully argued for a twenty-one-foot buffer).  Louisiana lawmakers made no findings to explain their choice of a much more expansive prohibition—a problem compounded by the fact that, under the Act's plain text, multiple officers on the same scene are authorized to issue overlapping orders.  *See* Erbach Decl. ¶ 18; Thomas Decl. ¶ 16.

But even if the Act's application to Plaintiffs' newsgathering could be characterized as content-neutral, the analysis would differ little.  Even content-neutral orders restricting newsgathering must, at minimum, be "narrowly tailored to serve a significant government interest," *Reed v. Lieurance*, 863 F.3d 1196, 1211 (9th Cir. 2017), and must leave open "alternative observation opportunities" to document the event at issue, *id.* at 1212; *see also In re Express-News Corp.*, 695 F.2d at 808–09 ("[A]n inhibition of press news-gathering rights must be necessitated by a compelling governmental interest, and . . . narrowly tailored to serve that interest." (citation and internal quotation marks omitted)).  Simply put, adjusting the standard of

review does not solve Louisiana's fundamental problem:  It needs some legitimate reason to criminalize Plaintiffs' journalism, but it has none.  There is no valid state interest in prohibiting newsgathering that is "not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location and to watch and listen to what is going on around them."  *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 606 (7th Cir. 2012).  And even if there were, Louisiana still would not be able to find a basis for choosing a twenty-five-foot buffer when the Fifth Circuit has held that six feet is enough.  *See Perkins*, 2023 WL 8274477, at *7; Webster, *supra*.

Moreover, as the practical experience of Plaintiffs' journalists underlines, the Act's twenty-five-foot perimeter does not leave open "alternative observation opportunities."  *Lieurance*, 863 F.3d at 1212.  Rep. Fontenot's assertion that "there is really nothing within a twenty-five feet span that someone couldn't pick up on video if they were at five feet," Hearing on HB 173, *supra*, at 1:40:35–45, is simply incorrect.  It will often—or even typically—be the case that twenty-five feet is too far for journalists to obtain a clear line of sight to observe and record newsworthy events, especially in crowded, tumultuous situations like protests, parades, or major sporting events.  *See* Erbach Decl. ¶ 6; Sprang Decl. ¶ 3; Thomas Decl. ¶ 4; Fernelius Decl. ¶ 9.  That distance is likewise far too great to reliably capture audio or interview sources on the scene.  *See* Thibodeaux Decl. ¶ 7; Sprang Decl. ¶ 4; Fernelius Decl. ¶¶ 5–6.  As a result, the Act's inevitable effect will be to foreclose newsgathering and reporting about newsworthy matters in a broad range of situations involving members of law enforcement.

The Act's sponsor, Rep. Fontenot, effectively conceded as much in insisting that the press and public "aren't trying to read the officer's name on his uniform," and therefore need not be close enough to see it.  *See* Hearing on HB 173, *supra*, at 1:44:55–1:45:05.  This, too, is

incorrect.  Plaintiffs' journalists need to be within close proximity of officers in order to verify details like names and badge numbers, *see* Fernelius Decl. ¶ 5, without which it would be impossible to hold officers' accountable for their conduct on duty, *see Fields v. City of Phila.*, 862 F.3d 353, 360 (3d Cir. 2017) (noting that the right to document policing is necessary to "identify and discipline problem officers"); *see also* Zipporah Osei et al., *We Are Tracking What Happens to Police After They Use Force on Protestors*, ProPublica (July 29, 2020), https://perma.cc/D63N-EKSQ.  But as the legislative history illustrates, the Act ultimately rests on a basic quarrel with the proposition that the First Amendment "guards against the miscarriage of justice by subjecting the police"—and the important public powers they exercise—"to extensive public scrutiny."  *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966).

    For each of these reasons, Plaintiffs are likely to succeed on the merits of their claim that the Act violates the First Amendment as applied to their nonobstructive newsgathering.

    C.    The Act violates the First Amendment on its face.

    The Act also violates the First Amendment on its face.  Even setting aside the fact that the Act can be triggered by "approaching" newsworthy events "to carry out plaintiffs' protected monitoring and recording," *Brown*, 86 F.4th at 779, all of the Act's applications implicate the First Amendment because even if it were interpreted to "say[] nothing about speech on its face," the statute nevertheless "restricts access to traditional public fora and is therefore subject to First Amendment scrutiny," *McCullen*, 573 U.S. at 476.  As a result, the law is invalid on its face unless Louisiana can carry its burden to justify it under strict or—at a minimum—intermediate scrutiny.  *See id.* (invalidating buffer-zone law on its face under intermediate scrutiny); *see also Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 666 (2004) (even in preliminary-injunction posture, "the Government bears the burden of proof" on the constitutionality of statutes that restrict First

Amendment activity).  Louisiana can make neither showing here because the Act "vests unbridled discretion in a government official over whether to permit or deny expressive activity," including Plaintiffs' lawful newsgathering.  *City of Lakewood*, 486 U.S. at 755.

        a.        <u>The Act is a content-based prohibition that fails strict scrutiny.</u>

As already previewed above, the Act imposes content-based burdens on expression about policing in particular.  Because pre-existing Louisiana law "already encompassed physical interference" with peace officers, the Act's "only evident purpose" is "to reach expressive activity" in order "to burden a narrow category of disfavored speech."  *Brown*, 86 F.4th at 782. What's more, in order "[t]o qualify as content-neutral," a law "cannot invest unbridled discretion" that might be *used* to discriminate on the basis of content.  *Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014) (citation and internal quotation marks omitted); *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133 n.10 (1992) ("[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so."). The Act has just that defect.  In each respect, it triggers strict First Amendment scrutiny.

The Act cannot survive that review because it is not—by any stretch of the imagination— "narrowly tailored" to "a compelling governmental interest."  *Town of Gilbert*, 576 U.S. at 171. Preventing members of the press and public from standing "close" to peace officers is not, without more, an interest that justifies restricting expression.  *Perkins*, 2023 WL 8274477, at *7. And the Act entirely fails to channel officers' discretion toward any other valid goal.  It does not require, for instance, that an individual's presence "impede the [officers'] ability to perform their duties," *id.*, or that the individual intend to interfere.  On the contrary, the Act "vests unbridled

discretion in a government official over whether to permit or deny expressive activity," *City of Lakewood*, 486 U.S. at 755, empowering officers to issue orders on their own say-so. And as already explained above, the Act's twenty-five-foot perimeter is far broader than necessary to accommodate any legitimate governmental interest.

Neither can Louisiana demonstrate that the Act is "the least restrictive means to further public safety," or any other legitimate goal. *Blitch v. City of Slidell*, 260 F. Supp. 3d 656, 670 (E.D. La. 2017) (citation and internal quotation marks omitted). To the extent the law is justified by concerns about safety or obstruction, Louisiana has a raft of other statutes on the books that make interfering with or disrupting police engaged in official business a crime. *See, e.g.*, La. Rev. Stat. § 14:329; La. Rev. Stat. § 14:329.3. Against that backdrop, Louisiana cannot explain why "available generic criminal statutes" fail to address whatever government interest the Act notionally serves. *McCullen*, 573 U.S. at 492.

> b.    The Act also would fail intermediate scrutiny.

Even if the Act were construed as a time, place, or manner restriction, or a law that also targets conduct, *see Nat'l Press Photographers Ass'n*, 90 F.4th at 790 ("conduct regulations" that have "an incidental effect on speech" and "time, place, and manner restrictions" both "fall under the umbrella of intermediate scrutiny"), it would remain invalid on its face for much the same reason: It prohibits with sweeping breadth expressive activity that poses no risk of obstruction.

The Seventh Circuit's decision in *Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012), is instructive. There, the court considered a facial challenge to a content-neutral ordinance that criminalized "knowingly . . . [f]ail[ing] to obey a lawful order of dispersal" by a law enforcement officer "where three or more persons are committing acts of disorderly conduct in the immediate vicinity, which acts are likely to cause substantial harm or serious inconvenience, annoyance or

alarm." *Id.* at 450 (quoting Chicago Municipal Code § 8-4-010(d)). The court explained, as "[t]he Supreme Court has held," that "when individuals ordered to disperse or move along manifest a 'bona fide intention to exercise a constitutional right,' a city may criminalize their refusal only when its 'interest so clearly outweighs the [individuals'] interest sought to be asserted that the latter must be deemed insubstantial.'" *Id.* at 459 (quoting *Colten v. Kentucky*, 407 U.S. 104, 111 (1972)). In other words, the government's interest "prevails only if the nuisances at issue risk substantial harm or if dispersal is otherwise *necessary*." *Id.* Applied to the ordinance before it, the Seventh Circuit concluded that orders to disperse on the basis of "serious inconvenience" or "alarm" violated the First Amendment because they could be issued "to individuals exercising protected First Amendment rights" without any showing that dispersal would be "necessary." *Id.*

HB 173 goes even further than the ordinance in *Bell*, containing no standard whatsoever—not even one as vague as "serious inconvenience"—that might limit when an officer may issue an order. And where the Seventh Circuit faulted the ordinance in *Bell* for requiring "inconvenience" without clarifying the *kind* that might give rise to a valid order to disperse, the Act fails to require any (even minimal) disruption to law enforcement activities. 697 F.3d at 459. It is triggered simply by a law enforcement officer's say-so. Thus, to an even greater degree than the ordinance struck down in *Bell*, the Act "lacks the necessary specificity and tailoring to pass constitutional muster, and . . . substantially impacts speech." *Id.*

Further, intermediate scrutiny would require Louisiana to "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests," *McCullen*, 573 U.S. at 495, and that it "seriously undertook to address the problem with less intrusive tools . . . that other jurisdictions have found effective," *id.* at 494. But there is no

evidence that Louisiana could not have achieved its interests by relying on already "available generic criminal statutes," *id.* at 492, as discussed above, or by requiring proof that an individual's presence obstructs or intends to obstruct officers' duties, or while providing a defense for individuals exercising First Amendment rights.  The result is that Louisiana is just one of two states in the union with such a statute,[5] and the lack of "comparable limits in other States" should have been a clear "danger sign[]" to lawmakers that the Act "may fall outside tolerable First Amendment limits."  *Randall v. Sorrell*, 548 U.S. 230, 253 (2006).

For these reasons and those discussed above in connection with Plaintiffs' as-applied claim, the Act cannot survive even intermediate scrutiny.  Under any plausibly relevant standard of review, the law is clear that statutes "vest[ing] unbridled discretion in a government official over whether to permit or deny expressive activity" violate the First Amendment—period.  *City of Lakewood*, 486 U.S. at 755.  HB 173 does just that.  It is invalid on its face.

D.      HB 173 is void for vagueness under the Due Process Clause.

In addition to its First Amendment defects, the Act is unconstitutionally vague.  It has long been settled that "[f]reedom of speech and of the press . . . are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment," *Kay v. White*, 286 F. Supp. 684, 686 (E.D. La. 1968) (quoting *Gitlow v. New York*, 268 U.S. 652, 666 (1925) (omission in original)), and a statute is "impermissibly vague"—and thus a violation of due process—if it "fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests," *Morales*, 527 U.S. at

---

[5]      The other is Indiana.  Ind. Code § 35-44.1-2-14.  The next closest comparator is Florida—but that state's buffer-zone law prohibits approaching an officer with the *specific intent* to "[i]mpede or interfere with" the performance of their duties.  Fla. Stat. § 843.31(2)(a)(1).

52 (plurality opinion).[6]  The Act falls short on two independent grounds:  It "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," *id*. at 56 (plurality opinion), and it "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement."  *Id*.

As to fair notice, as other courts have observed in the context of liability for failure to obey a law enforcement order, due process requires that a law provide "warning about the behavior that [can] prompt[] a lawful dispersal order."  *Bell*, 697 F.3d at 462; *see also Agnew v. District of Columbia*, 920 F.3d 49, 60 (D.C. Cir. 2019) (where the standards for issuing a move-on order are themselves vague, "[a] person's knowing failure to obey such an order could do nothing either to cure the officer's lawless discretion or to establish the individual's culpability").  But the Act authorizes officers to order an individual to withdraw for any reason (or no reason), and "[s]uch an order cannot retroactively give adequate warning of the boundary between the permissible and the impermissible," *Morales*, 527 U.S. at 59 (plurality opinion); *see also id.* at 69 (Kennedy, J., concurring in part and concurring in the judgment) (where a statute "would reach a broad range of innocent conduct . . . it is not necessarily saved by the requirement that the citizen must disobey a police order to disperse before there is a violation").  Otherwise, a statute that read "do what any officer tells you to do" would provide fair notice despite affording citizens no ability to conduct themselves so as to avoid a confrontation with law enforcement.

Moreover, the Act independently fails to provide fair notice and an opportunity to comply because reporters cannot workably determine whether they are within twenty-five feet of law enforcement when gathering news in the field, especially at a crowded, fast-evolving public

---

[6]    Independent of their First Amendment interests, Plaintiffs also have a liberty interest in their ability to move freely in public spaces.  *See Morales*, 527 U.S. at 53 (plurality opinion); *Vincent v. City of Sulphur*, 805 F.3d 543, 548 (5th Cir. 2015) (noting that "Supreme Court decisions amply support the proposition that there is a general right to go to or remain on public property for lawful purposes").

event.  *See* Fernelius Decl. ¶ 15; Waivers Decl. ¶¶ 16–18; Thomas Decl. ¶ 15; Thibodeaux Decl.

¶ 9.  And that difficulty is compounded by the fact that the prohibited zone "floats."  *Schenck v.*

*Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377 (1997).  Indeed, compliance will be

impossible when there is no practical way for a reporter to retreat through a crowd, where there

is not enough space on a sidewalk to withdraw, or where multiple officers issue overlapping or

contradictory orders.  *See* Fernelius Decl. ¶ 16; Erbach Decl. ¶ 18; Thomas Decl. ¶ 16.

Finally, the Act is independently void for vagueness because it "is so standardless that it

authorizes or encourages seriously discriminatory enforcement."  *Williams*, 553 U.S. at 304.  In

*Morales*, a majority of the Supreme Court squarely held that a lawful-order statute "violates the

requirement that a legislature establish minimal guidelines to govern law enforcement," 527 U.S.

at 60 (citation and internal quotation marks omitted), if it "does not provide any guidance to the

officer deciding whether such an order should issue" in the first place, *id.* at 62.  The Act does

just that, with no standard of any kind to guide officers in deciding who should be ordered to

move and under what circumstances.  In other words, it "delegates basic policy matters to

policemen," who decide whether to issue an order or make an arrest "on an ad hoc and subjective

basis, with the attendant dangers of arbitrary and discriminatory application."  *Grayned v. City of*

*Rockford*, 408 U.S. 104, 108–09 (1972).  In that respect, the Act—like any other law that

purports to grant officers the authority "to decide arbitrarily which members of the public they

will order to disperse"—is "indistinguishable from the law . . . held invalid in *Shuttlesworth v.*

*Birmingham*, [382 U.S. 87, 90 (1965)])."  *Morales*, 527 U.S. at 58–59 (plurality opinion).

## II.    The remaining factors favor preliminary injunctive relief.

The rest of the preliminary-injunction factors follow the merits.  In cases like this one

involving a chilling effect on the exercise of First Amendment rights, the irreparable harm factor

is necessarily satisfied when plaintiffs can show a likelihood of success on the merits, because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Book People*, 91 F.4th at 341 (citation omitted). And once the moving parties have established they "are likely to succeed on the merits of their First Amendment claim, the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment." *Id.* In other words, "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Id.* (citations omitted). Here, an injunction that shields the press from the Act's chilling effects—relieving Plaintiffs of the threat of arrest and self-censorship—would do no harm to any legitimate government interest and would serve the "major purpose" of the First Amendment: "to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). A preliminary injunction should therefore be entered here.[7]

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court issue a preliminary injunction prohibiting Defendants from enforcing the Act.

Dated: September 13, 2024

Respectfully submitted,

*/s/ Katie Townsend*
Katie Townsend (*pro hac vice*)
ktownsend@rcfp.org
Grayson Clary (*pro hac vice*)
gclary@rcfp.org
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Fax: 202.795.9310

---

[7]    Plaintiffs respectfully request waiver of a bond, *see* Fed. R. Civ. P. 65(c), since Defendants are not likely "to incur any significant monetary damages as a result of the preliminary injunction," *Thomas v. Varnado*, 511 F. Supp. 3d 761, 766 (E.D. La. 2020).

*/s/ Scott L. Sternberg*
**STERNBERG NACCARI & WHITE LLC**
Scott L. Sternberg, La. Bar No. 33390
M. Suzanne Montero, La. Bar No. 21361
935 Gravier Street, Suite 2020
New Orleans, LA 70112
Phone: (504) 324-1887
Fax: (504) 534-8961
scott@snw.law | suzy@snw.law

*Attorneys for Plaintiffs Deep South Today,* d/b/a
*Verite News*, *Gannett Co., Inc., Gray Local Media,
Inc., Nexstar Media, Inc.*, *Scripps Media Inc., and
TEGNA Inc.*

26